IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOE A. BEARD, JR. | ) | |
| et al. | ) | |
|     Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO 2:08-0490-KD-C |
| | ) | |
| CHARLES LANGHAM, individually, | ) | |
| CHARLES LANGHAM   d/b/a | ) | |
| CHARLES LANGHAM LOGGING and | ) | |
| LANGHAM REPAIR SHOP, INC. | ) | |

## ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Docs. 28, 29, 30, 31), Plaintiff's Response in opposition (Docs. 34, 35) and Defendants' Reply thereto (Doc. 39). For the reasons set forth herein, the Defendants' motion for summary judgment is **GRANTED** as to the Fair Labor Standards Act claims for overtime compensation.


## I.    Background

Plaintiff instituted this suit under the Fair Labor Standards Act ("FLSA"), and jurisdiction obtains pursuant to 28 U.S.C. § 1331. (Docs. 1, 9).


## A.    The Parties

Plaintiff Joe A. Beard, Jr.("Beard"), an Alabama resident, works as a tree topper for Defendants in the counties of the Southern District of Alabama. (Docs. 1, 9). Defendant Charles T. Langham, Sr. ("Langham, Sr.") is an individual doing business as Charles Langham Logging

("CLL").[1]  (Id.)  Beard brought this suit as an opt-in collective action pursuant to Section 16(b) of the Fair Labor Standards Act, alleging a potential class comprised of 10-15 non-exempt employees. (Id.)

**B.    Claims**

**1.    Fair Labor Standards Act Overtime Violations**

Plaintiff alleges that for at least the three years preceding the filing of the Complaint, Defendants violated the FLSA's overtime wage requirements by failing to pay Plaintiff and others similarly situated one and one half of each employee's regular hourly rate per hour for work each employee performed for Defendant in excess of 40 hours per week.  (Doc. 1).

**2.    Work and Labor[2]**

Plaintiff alleges that Defendants owe him and similarly situated employees compensation for  one half hour lunch periods, during which work was performed, as well as compensation for other "off the clock work."  (Doc. 1)

---

[1]Plaintiff Beard also alleges, and Defendant denies, that Beard is an employee of Langham Repair Shop, Inc. and that the Defendants are one business enterprise and/or alter egos of one another.  (Docs. 1, 9).  According to the affidavit of Charles T. Langham, Jr., Defendant Charles T. Langham, Sr.'s son, Charles Langham Logging is not incorporated or organized as any type of separate legal entity.  (Doc. 29-1).  Langham Repair Shop, Inc. is a corporation with its principal place of business in Greensboro, Alabama.  (Id.)  Although Langham Repair Shop is 100% owned by Charles Langham, none of the Plaintiffs have ever worked for Langham Repair Shop, and Langham Repair Shop has never paid any of the Plaintiffs for any services rendered. (See Smith Dep., Doc. 29-9 at 28-30; Singleton Dep., Doc. 29-10 at 38; Beard Dep, Doc. 29-7 at 46; and Dixon Dep., Doc. 29-8 at 39).

[2] To the extent plaintiff is claiming a failure to pay compensation for regular time worked, the claim does not appear to be viable under the FLSA.   This is so because there has been no allegation of a violation of the FLSA minimum wage provision and, as discussed *infra*, plaintiff's employer is exempt from the FLSA overtime pay provision.  Thus, the basis for plaintiff's claim of compensation owed is unclear.   However, because it has not been addressed by either party, the claim remains pending.

C.      **Affidavits**

1.      **Charles T. Langham, Jr.**

Among the evidence Defendants submitted in support of their motion for summary judgment is an affidavit sworn by Charles T. Langham, Sr.'s son, Charles T. Langham, Jr. ("Langham, Jr."). (Doc. 29-1).  In the affidavit, Charles Langham Jr. stated that his father is the sole owner and proprietor of Charles Langham Logging, which is not a legal entity separate from Charles T. Langham, Sr.  Langham, Jr. stated that he had worked off and on for his father at CLL for over the last 30 years, and averred that he knows firsthand how his father manages the business and conducts its day-to-day operations.

Charles Langham, Jr. further stated that, "to the best of [his] knowledge," Charles Langham Logging has not employed more than eight employees in its logging operations during any one workweek at any time during the last three years, which is the relevant time period for Plaintiff Beard's Complaint.  (Id.; see also Docs. 1, 9).  Langham, Jr. averred that he reviewed time sheets kept in the normal course of business by CLL, and he listed in the affidavit the number of employees for each workweek during the three-year relevant time period.  (Doc. 29-1).  In no week does the number of employees per week listed in the affidavit exceed eight.  (Id.)

Langham, Jr. explained the assumptions he used to calculate the number of employees for each week:

(1) Charles T. Langham, Sr. was not included in the employee count.  Langham, Jr. stated that his father the sole owner and proprietor of CLL, does not take a salary from the company, and that he only withdraws money from the business if a net profit is realized.  (Id.)

(2) Langham, Jr. did not include CLL's bookkeeper in the employee count.  (Id.)  The

affidavit explained that CLL has generally employed one bookkeeper to handle payroll each week, that the bookkeeper works no more than 10 to 15 hours per week, and that the bookkeeper does not do any logging operations.  (Id.)

(3) The contract haulers that CLL hires to transport logs to the sawmill were not counted as employees.  (Id.)  Langham, Jr. averred that CLL contracts with haulers who own their own trucks, pay for their own fuel, and perform their own maintenance on the trucks.  (Id.)  He further stated that the haulers typically perform work for other logging companies in the area, and that CLL never required the loggers to pick up a load from CLL and transport such a load to the mill.  (Id.)  According to Langham, Jr., CLL would contact the individual haulers each week to see if they would be interested in hauling logs, and would advise interested haulers where CLL would be operating that week, when the logs would likely be ready for transport, and when to transport the logs.  (Id.)  The affidavit states that "CLL exerted no other supervision or control over these contract haulers," and Langham, Jr. explained that because CLL's logging operation "is on a very small scale with only one logging crew . . . it is not economical or feasible for [CLL] to have [its] own log trucks to transport the logs from the landowner's site to the mill."  (Id.)

**2. Thomas Alvin Christian**

In conjunction with filing their reply brief, Defendants submitted a second affidavit, one sworn by Thomas Alvin Christian ("Christian"), the principal of Thomas Christian Trucking, a thirty-year-old company that has performed contract hauling for CLL over the last three years. (Doc. 39-1).

Christian stated that his company provides contract hauling services to many different logging companies based in the Hale County area.  (Id.)  Christian further averred that he: owns the

trucks used in his business; pays for all the fuel for those trucks; is responsible for purchasing insurance for the trucks; is responsible for maintaining the trucks; and maintains an Alabama Commercial Driver's license in order to operate the trucks.  (Id.)  Christian explained that, as a contract hauler, he contracts with local logging companies to transport timber cut from a landsite to an appropriate mill.  (Id.)  Christian stated that he negotiates with the logging companies how much he will be paid for each load of timber transported from the site to the mill.  (Id.)  According to Christian, the logging company did not deduct payroll taxes from his checks, but instead provided him with a 1099 at the end of the year to document payment for services rendered.  (Id.)  As a contract hauler who owns his own trucks, Christian is free to negotiate and contract with different logging companies, and has an opportunity to make a substantial profit in his business.  (Id.) Christian identified the following factors that enable him to profit as a contract hauler:  (1) knowledge and experience in the logging industry, which helps him to negotiate a fair rate for his services; (2) performing maintenance on his own vehicles; (3) finding the lowest insurance rates; and (4) finding the best fuel prices.  (Id.)

Christian stated that he has provided the same services to both CLL and "numerous other logging companies in the area" over the last three years.  (Id.)  He indicated that he does "not consider [him]self an employee of CLL," and that he "do[es] not believe that [his] livelihood is dependent on [his] work for [CLL]." (Id.) Christian assessed his livelihood as "primarily dependent on the health of the logging industry in general."  (Id.)  Christian further stated that he was "aware that CLL also used contract haulers other than [his] company," including Randy White Trucking and Skelton Trucking, and that, to the best of his knowledge, these trucking companies "provided the same contract services that his company provided to CLL in much the same manner."  (Id.)

5

**II.**   **Analysis**

**A.**   **Applicable Law**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[3]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment also always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations

---

[3]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56 (c).

omitted).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).


**B.      Discussion**

      **1.      Fair Labor Standards Act Overtime Requirements**

Congress enacted the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*  to "eliminate low wage and long hours," and to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers."  Usery v. Pilgrim Equip. Co., Inc., 527 F.2d 1308, 1310 (5th Cir. 1976).  The FLSA imposes a minimum wage requirement for covered employees, and prohibits employers from employing any worker for a workweek in excess of forty hours unless the employee receives compensation for the excess hours at a rate not less than one and one half times the regular rate at which the worker is employed.  Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1318 (S.D. Fla. 2001), citing 29 U.S.C. §§ 206, 211(c), & 207(a)(1).

      **2.      Qualified Logging Operations Exempt from Overtime Requirements**

Section 213 of the FLSA provides that certain industries and businesses are exempt from the act's requirements.  Section 213(b)(28) exempts qualified logging operations from the maximum hour requirements imposed by Section 207 of the statute:

> The provisions of section 207 shall not apply to . . . any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plan, railroad, or other transportation terminal,

> if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight.

29 U.S.C. § 213(b)(28).  The number of employees and the applicability of the exemption are, by regulation, to be determined on a weekly basis:

> The determination of the number of employees employed in the named operations is to be made on an occupational and a workweek basis.  Thus the exemption will be available in one workweek when eight or less employees are employed in the exempted operations and not in another workweek when more than that number are so employed.

29 C.F.R. § 788.13.

Defendants argue they are exempt from the FLSA's overtime requirements because CLL has not employed more than eight employees during any workweek within the three-year time period relevant to this suit.  As noted above in the summary of Charles T. Langham, Jr.'s affidavit, Defendants' calculation of the number of employees does not include Charles T. Langham, Sr., the owner of the CLL; CLL's part-time bookkeeper; and the contract haulers that CLL hires to transport logs to the sawmill.

Plaintiffs dispute that the logging operation exemption applies to CLL because, they argue, both the contract log haulers and Langham, Sr. should be considered "employees" of CLL.[4] Plaintiffs contend that if the log haulers and Langham, Sr. are counted as employees, the number of employees employed by CLL during "virtually every week" of the relevant time period will exceed eight.  Plaintiffs point out that for any weeks during which the number of employees exceeded eight, Section 213(b)(28)'s exemption would not apply, and summary judgment for Defendants would be

---

[4]Nowhere in their Response do Plaintiffs contest Defendants' exclusion of CLL's bookkeeper from the employee count.

precluded.  See 29 C.F.R. § 788.13.  Accordingly, the disposition of this motion turns on the question of whether Langham, Sr. and the log haulers are "employees" within the meaning of the FLSA.

Defendant "carries the burden of proving the exemption, and [this Court must] narrowly construe the overtime provisions against the employer."  Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004).  The Eleventh Circuit has held that the "Act should be interpreted liberally in the employees' favor," and that the employer "must prove applicability of an exemption by 'clear and convincing evidence.'"  Birdwell v. City of Gadsden, Ala., 970 F.2d 802, 805 (11th Cir. 1992) (citation omitted).

Under the FLSA, the term "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee," and the term "'employee' means any individual employed by an employer."  29 U.S.C. § 203(d) & (e)(1).  "Employ," is defined under the Act as "includes to suffer or permit to work."  Id. at (g).  As the Supreme Court has observed, this definition of "employee" is quite expansive.  See Nationwide Mut. Ins. Co. v. Dardin, 503 U.S. 318, 326 (1992) (noting that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

a.      **Charles T. Langham, Sr.**

In support of their argument that Langham, Sr. should be classed as a CLL employee, Plaintiffs  point to activities Langham, Sr. performed on the job: "cut[ting] the logs in the woods," "transport[ing] them to the loading site," and "like the log truck drivers and other CLL employees . . . dr[iving] the log truck to sawmills."  (Doc. 34).  Plaintiffs note that these activities are "the duties which were specifically listed by Congress as the named operations which determine what

people should be counted as an employee for the purpose of the subject exception." (Id.)

However, the statutory and regulatory sections Plaintiffs cite do not purport to define the terms "employer" or "employee." See 29 U.S.C. § 213(b)(28) & 29 C.F.R. § 788.1. As noted above, those terms are defined elsewhere in the statute. If those definitions are read together, the term "employee" would be defined as "any individual . . . permit[ted] to work . . . [by a] person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d), (e)(1), & (g). When Charles T. Langham, Sr.'s name is inserted in place of the words and definitions of "employer" and "employee," the definition of "employee" borders on existential comedy: "any individual . . . permitted to work . . . [by Charles T. Langham, Sr.] acting directly or indirectly in the interest of [Charles T. Langham, Sr.] in relation to [Charles T. Langham, Sr.]." The text does not support such a reading: clearly the act does not contemplate employers being classed as "employees." If it had intended for business owners working in "forestry or lumbering operations" to count towards the 8 employees contemplated by the statute's overtime requirements, Congress could easily have substituted the phrase "and employers" in place of the phrase "employed by his employer" in section 29 U.S.C. § 213(b)(28). Accordingly, as a matter of law Charles T. Langham, Sr. is not an employee for the purposes of applying Section 213(b)(28)'s exemption from overtime requirements.

This conclusion is bolstered by Langham, Jr.'s averment that his father, unlike the other CLL employees, does not take a salary from the company and only withdraws money from the business if a net profit is realized. See Alperstein v. Foster & Sons Sportswear Co., Inc., 193 F.Supp.161, 162-63 (E.D. Pa. 1961) (holding that plaintiff could not be considered an employee and therefore could not avail himself of FLSA. Although the plaintiff received weekly payments from the

10

defendant for a matter of months, the court determined that these were advancements rather than "payments to an employee in the ordinary course of business."  Instead of finding the plaintiff to be an employee of the defendant, the court concluded that he was "merely a party to an unfortunate business venture."); Hishon v. King & Spalding, 678 F.2d 1022, 1028 (5th Cir. 1982), rev'd on other grounds, 467 U.S. 69 (1984) (law firm partners who were "joint venturers" were not considered "employees" for the purposes of applying Title VII).

### b. Log Haulers

Defendants refer to the individuals who haul logs for CLL as "contract haulers." (See Doc. 29-1).  However, all parties acknowledge that the label parties put on the relationship between Defendants and the log haulers is not determinative.  See Docs. 30 & 34 (both cite Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.")).

Instead, courts "focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he or she renders his or her services.  In other words, [the courts'] task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself."  Molina v. South Florida Exp. Bankserv., Inc., 420 F. Supp. 2d 1276, 1283 (M.D. Fla. 2006) (citing Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 303 (5th Cir. 1998); Donovan v. Tehco, Inc., 642 F.2d 141, 143 (5th Cir. 1981); Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1348 (M.D. Fla. 1997); Santelices, 147 F. Supp. 2d at 1318)).  This determination

> involves a number of factors, including the degree of control
> exercised by the alleged employer; the extent of the relative

> investments of the worker and the alleged employer; the degree to
> which the worker's opportunity for profit and loss is determined by
> the alleged employer; the skill and initiative required in performing
> the job; and the permanency of the relationship.

Id. (internal citations and quotation marks omitted).  In addition to the five factors outlined above,

certain other courts have included a sixth factor: "the degree to which the alleged employee's tasks

are integral to the employer's business."  See Molina, 420 F. Supp. 2d at 1284 n. 22.

   The Supreme Court has held that "[n]o one isolated factor is determinative . . . .'" Id.

(quoting Rutherford Foods, 331 U.S. at 730). However, the "touchstone of 'economic reality' in

analyzing a possible employee/employer relationship for purposes of the FLSA is dependency.  The

courts look at all of the surrounding circumstances of the 'whole activity' to determine whether the

putative employee is economically dependent upon the alleged employer." Santelices, 147 F. Supp.

2d at 1319; Usery, 527 F. 2d at 1311 (The five economic reality factors are "tools to be used to

gauge the degree of dependence of alleged  employees on the business with which he or she is

connected.  It is dependence that indicates employee status.") .  This dependency inquiry, in turn,

"may be broken down into two factors:  (1) how specialized the nature of the work is, and (2)

whether the individual is in business for himself." Molina, 420 F. Supp. at 1284 (internal quotation

marks omitted); see also Mednick v. Albert Enters., Inc., 508 F.2d 297, 302 (5th Cir. 1975).

   Examining each of the enumerated factors in light of the record evidence, this Court

concludes that the log haulers are economically independent of and cannot be considered employees

of Defendants:

### i.      Degree of Control

   In assessing the degree of control exercised over would-be employees, court have considered

evidence that reflects control over the manner and means by which work is performed.  See Halferty

v. Pulse Drug Co., Inc., 821 F.2d 261, 266 (5th Cir. 1987).  Seeking to emphasize this point, Plaintiffs cite Tobin v. Anthony-Williams Mfg. Co., 196 F.2d 547, 550 (8th Cir. 1985) ("Anthony-Williams").  In Anthony-Williams, the Eighth Circuit found that log haulers were employees of a lumber company, in part because the defendant controlled their activities by determining the amounts of the haulers' deliveries based on "the work of [the] defendant's loader and . . . the capacity of [the] defendant's storage facilities."  The court of appeals also found that the defendant exercised control by  restricting the haulers from using trucks that the haulers owned and operated for anything other than the defendant's business, even on days during which the haulers were not working for the defendant.

The facts of the case at bar are distinguishable from those underlying the dispute in Anthony-Williams.  Both of the affidavits submitted by Defendants indicate that the individuals who haul logs for CLL own their own trucks and work not only for CLL, but also for other logging companies.  Plaintiff has not contested these averments.  By contrast, Anthony-Williams forbid the log haulers they employed from using their trucks for any other purpose besides hauling for the defendant.  The Anthony-Williams employees' ability to haul (and, therefore, to earn) was further constrained by the fact that defendant dictated the amount to be hauled based in part on the capacity of its own storage facilities and the availability of its loader.  In the case at bar, however, there is no evidence that CLL controlled each of the many variable components of the log haulers' livelihood.  On the contrary, Charles T. Langham, Jr. averred that CLL never required the loggers to pick up a load from CLL and transport that load to the mill.  According to Langham, Jr., CLL would contact the individual haulers each week to see if they would be interested in hauling logs, and would advise interested haulers where CLL would be operating that week, when the logs would likely be ready

13

for transport, and when to transport the logs.  The affidavit states that "CLL exerted no other supervision or control over these contract haulers."

Plaintiffs point out that Defendants see the log truck drivers multiple times during the day to "tell them what to do, where to place their trucks during the loading process in the field, [and] where to take which type of wood to the sawmill, etc."  Plaintiffs also note that CLL "require[d] not just daily sales reports but tickets from the log truck drivers on every trip they make."  (Doc. 34, citing Dep. of Tommy Langham).  However, these sort of instruction and reporting requirements do not rise to the level of controlling the haulers and/or their professional activities.  There is no indication that the log haulers are more "economically dependent" upon CLL than they would be in the absence of such instructions.  Moreover, it appears that such a level of detail may be necessary in order for the log haulers to successfully accomplish the task of transporting the logs from the field to the mill and/or  for CLL to appropriately compensate the haulers.

### ii.      Relative Investments of Log Haulers and CLL

In Anthony-Williams, the Eighth Circuit based its holding that haulers were employees in large part on the haulers' lack of a substantial investment in their trucks.  Id. at 547, 550. Approximately three years prior to the trial of that case, the defendant in Anthony Williams made new arrangements with its log haulers.  Id. at 547.  The haulers had previously been considered and paid as employees.  Id.  Under the new arrangement, the haulers purchased their trucks from the defendant and agreed to be paid for the logs hauled at a certain rate per thousand board feet hauled, depending on the actual length of the haul.  Id.  From this payment, the defendant would deduct $2 per thousand board feet hauled and would apply it to the purchase price of the truck.  Id.  Four out of the five drivers involved in the appeal had made no down payment on the purchase price of the

14

truck, and the remaining driver had made a down payment of $350.  Id.  None of the five pledged

their credit in the purchase agreement or agreed to pay for his truck in any specified time.  The

papers memorializing this "so-called 'sale'" of the trucks indicated that the trucks were to be used

only in connection with the defendant's business, and none of the truck drivers used them for any

other purpose.  Id.

      In this case, by contrast, Defendants present two affidavits, both stating that the log haulers

own their own trucks, pay for their own fuel, and are responsible for maintaining the their own

trucks.  Thomas Christian also averred that he is responsible for purchasing insurance for the trucks

he uses in his business.  Plaintiff has not contested these averments.  Indeed, Plaintiff has submitted

no evidence that Defendants make any investment in the equipment and materials that the log

haulers need in order to perform their tasks and conduct their businesses.  Unlike the situation

presented in the Anthony-Williams opinion, there is no allegation or evidence that Defendants

subsidized the purchase of the log haulers' vehicles.

      Plaintiff claims that the court should find that the investment factor militates in favor of a

finding of economic dependence because the Defendants' alleged demand for the log haulers'

services "control[s] the number of employees or helpers of the log truck drivers retained by the

haulers."  However, at least one district court reached a different conclusion in a case that presented

similar facts.  In Tobin v. Cherry River Boom and Lumber Co., 102 F. Supp. 763 (D.W.Va.

1952)("Cherry River"), the court was called upon to decide whether "woods contractors" should be

considered the employees of an established lumber and timber operation with approximately 450

persons on its payroll.  Next to none of the woods contractors (there was one exception) in Cherry

River entered into contracts with any lumber company other than the defendant, and yet the woods

contractors also "employ[ed] their own workmen." Id. at 765.  The Cherry River court held that the

woods contractors were properly considered independent contractors rather than employees under

the FLSA, observing that

> if all the [woods contractors] were to be classified as employees for
> the purposes of the Act, then who could ever be a contractor in a
> timber operation?  These men furnished their own equipment;
> employed their own workmen; constructed their own facilities, often
> at large cost to themselves . . . and enjoyed the opportunity to make
> substantial profits from their operations if their work was efficiently
> and economically managed.

Id. at 767.  Moreover, Plaintiffs present no evidence that the log haulers were "not at liberty to hire

[their] own helpers as a true independent contractor c[an]."  See Santelices v. Cable Wiring, 147 F.

Supp. 2d at 1321 (fact that cable installer was required to seek the defendant's permission before

recruiting help for a job weighed in favor of finding of economic dependence).

Accordingly, consideration of the investments made by the log haulers relative to the

investments made by CLL also weigh in favor of this Court's finding that the log haulers are not

economically dependent upon defendants.

### iii.    Degree to which CLL Determines the Log Haulers' Opportunity for Profit and Loss

Plaintiffs present no evidence in support of their assertion that "there was no real opportunity

for the [log haulers] to make more or less profit and absolutely no managerial skill" involved in

hauling for CLL.  These factually unsupported claims are directly contradicted by the affidavit of

log hauler Thomas Christian, who identified the following factors that enable him to profit as a

contract hauler:  (1) knowledge and experience in the logging industry, which helps him to negotiate

a fair rate for his services; (2) performing maintenance on his own vehicles; (3) finding the lowest

insurance rates; and (4) finding the best fuel prices.  In addition, as noted above, Plaintiffs' own brief suggests that the log haulers employ helpers.  Thus there is every indication that these log haulers, who manage their costs and employees and seek to negotiate favorable rates, maintain a greater degree of control over their profit and loss than the many logging companies who purchase their services.  Moreover, Thomas Christian stated that his livelihood is "primarily dependent on the health of the logging industry in general," a variable which is certainly not within the control of CLL.  There is no evidence that CLL's actions play a determinative role in the log haulers' opportunity for profit and loss.  As a result, this factor also supports the finding of economic independence.

### iv.    Skill and Initiative Required in Performing the Job

As discussed earlier, Defendants present evidence that succeeding as a log hauler requires industry savvy, administrative and managerial skills, and either the ability to perform truck maintenance or to negotiate a reasonable rate for maintenance.  The job also requires a commercial driver's license.  Although Plaintiffs may not consider these to be particularly rarefied skills, it is apparent that some acumen and initiative is necessary in order to succeed professionally and financially as a log hauler.  This factor does not weigh heavily in the Court's assessment of economic independence; neither does it militate against such a finding.

### v.    Permanency of the Relationship

Plaintiffs point to evidence that, during the relevant time period, CLL always used contract haulers, and often used the same haulers.  (See Doc. 34-11 & 34-12, citing Dep. of Tommy Langham).  However, Plaintiffs present no evidence that any given log hauler worked for Defendant during every week of the relevant time period.

For their part, Defendants present evidence, in the form of Thomas Christian's affidavit, that the log haulers were free to, and in fact often did perform work for other logging companies in the same area.  The duration and apparent durability of CLL's relationship with these log haulers does not dissuade this Court from finding that the log haulers are economically independent of CLL.

        **vi.**      **Degree to which the Log Haulers' Tasks are Integral to CLL's Business**

As alluded to above, not every court considers this factor in applying the economic realities test.  See Molina, 420 F. Supp. 2d at 1284, n.22.   Its application seems particularly unhelpful in an instance such as this because, as Defendants note, Congress specifically exempted small logging operations from the overtime requirements of the FLSA by enacting Section 213(b)(28).  Defendants have presented evidence that CLL's logging operation is conducted on a small scale with only one logging crew and that it is not economical or feasible for CLL to haul its own logs from the landowner's site to the mill.  To find that the log haulers are employees merely because they perform services that a small-scale logging operation requires to get its product to market would circumvent the exception Congress specifically created for such operations.

In light of the factors discussed above and the record evidence, this Court concludes that, despite the haulers' contributions to CLL's operations, they are economically independent contractors and cannot be considered employees for FLSA purposes.  No genuine issue of material fact exists that would preclude entry of summary judgment, as Plaintiff has failed to demonstrate that any of the Defendants are subject to the FLSA's overtime requirements.

18

**III.**     <u>**Conclusion**</u>

Based upon the foregoing, the Court finds that Defendants' Motion for Summary

Judgment (Docs. 28, 29, 30, 31) is due to be **GRANTED** as to the Fair Labor Standards Act

claim for overtime compensation.[5]

   **DONE** and **ORDERED** this the 5th day of **August, 2009.**


                    /s/ Kristi K. DuBose_____
                    **KRISTI K. DUBOSE**
                    **UNITED STATES DISTRICT JUDGE**

---

[5] As discussed in footnote 2, the "Work and Labor" claim remains pending.